UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSEPH McINTYRE and ANNE McINTYRE,

                      Plaintiffs,

      -vs-

CORNING INCORPORATED; CLAUDE SULLIVAN;
DAVID MANCHESTER; JOHN WALTER;  and
JOHN DOE(S) and JANE DOE(S),

                  Defendants.

**COMPLAINT**

Jury Trial Demanded

Plaintiffs Joseph McIntyre[1] and Anne McIntyre, by and through their attorneys, Bosman Law Firm, L.L.C., as and for their Complaint against Defendants Corning Incorporated; Claude Sullivan; David Manchester; John Walter;  and John Doe(s) and Jane Doe(s), respectfully allege as follows:

    1.  This is a Complaint under the Rehabilitation Act, the Human Rights Law of the State of New York, and common law to remedy violations of the rights of the Plaintiffs Joseph McIntyre and Anne McIntyre for injuries and harm caused by the Defendants, Corning Incorporated, Claude Sullivan, David Manchester, John Walter, and John Doe(s) and Jane Doe(s).

## JURISDICTION AND VENUE

    2.  This action is brought, in part, pursuant to the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* and the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.*

    3.  This action is for monetary damages as well as for declaratory, injunctive and

---

[1]Unless otherwise noted, references herein to "Plaintiff" are to Plaintiff Joseph McIntyre.

-1-

equitable relief to redress the deprivation of the Plaintiffs' rights secured to them by Federal law and the laws of the State of New York.

4.    Plaintiffs invoke the original and supplemental jurisdiction of this court to decide claims arising under Federal and New York State law, including, but not limited to, claims that Defendants committed unlawful discriminatory and retaliatory practices by, *inter alia*, denying Plaintiff Joseph McIntyre a position, creating and maintaining a hostile work environment for him, and otherwise treating him disparately in the terms, conditions and privileges of employment at Corning Incorporated.

5.    This court has supplemental jurisdiction over Plaintiffs' New York State law claims, including Plaintiff Joseph McIntyre's claims under the New York State Human Rights Law (Article 15, Executive Law of the State of New York) and Anne McIntyre's claim under common law.

6.    It appears that venue is proper in the Western District of New York in that the unlawful employment practices alleged herein were committed in whole or part in the Western District.

## **PARTIES**

7.    Plaintiff Joseph McIntyre, at all times relevant to this Complaint, is a male citizen of the United States and a resident of the State of New York, County of Chemung.  He was and is at all times relevant herein an employee of Corning Incorporated.

8.    Plaintiff Anne McIntyre, at all times relevant to this Complaint, is a female citizen of the United States and a resident of the State of New York, County of Chemung.  She was and is at all times relevant herein the wife of Plaintiff Joseph McIntyre.

9.   Plaintiff Joseph McIntyre is an "Employee" within the meaning of the Rehabilitation Act and the Human Rights Law of the State of New York.  During all relevant times herein, Plaintiff suffered from a disability within the meaning of the Rehabilitation Act and the Human Rights Law.

10.   Corning Incorporated is a corporation governed under the laws of the State of New York and at all relevant times has its principal place of business in Steuben County, State of New York.  Upon information and belief, Defendant Corning Incorporated is a recipient of Federal financial assistance via grants and substantial tax credits and also receives Federal contracts. Defendant Corning Incorporated is also an "Employer" within the meaning of the Human Rights Law of the State of New York.

11.   At all times hereinafter mentioned, Defendants Claude (Monty) Sullivan, David Manchester, John Walter, and John Doe(s) and Jane Doe(s) are natural citizens of the United States and supervisory officials/employees of Corning Incorporated.  Defendant Sullivan is the Director of Aircraft Operations.  Defendant Manchester is the Director of Maintenance. Defendant John Walter is the Supervisor/Manager of Maintenance.  At all times relevant hereto, these individual Defendants had authority over the terms and conditions of Plaintiff's employment and/or were aiders or abetters under the Human Rights Law.

### FACTS

12.     Plaintiff Joseph McIntyre has a speech disorder characterized by stuttering, which substantially limits the major life activity of speaking. He is also regarded as disabled by the Defendants. He is thus disabled within the meaning of the Rehabilitation Act and the Human Rights Law of the State of New York.

13.   Plaintiff began working for the Defendant Corning Incorporated on or about June 2008 as a line technician. Therein June 2011, he was also offered and accepted an apprenticeship to become an aircraft mechanic.

14.   Throughout his employment at Corning Incorporated, Plaintiff has been subjected to mocking and ridicule because of his speech disorder. He has also been subjected to acts of sexual harassment.

15.   Defendant Claude Sullivan repeatedly would make fun of Plaintiff because of his speech disorder, and would do so in the presence of Plaintiff's co-workers. Defendant Sullivan would also approach Plaintiff from behind and start massaging his shoulders while alone and in the presence of co-workers. Plaintiff advised Defendant Sullivan that such conduct was unwelcome and unwanted.

16.   Such activity interfered with Plaintiff's ability to do his job and Plaintiff sought to avoid Defendant Sullivan, rendering his job duties more difficult to perform.  In addition to the unwanted physical contact, Defendant Sullivan subjected Plaintiff to verbal harassment, making, for example, a comment about him licking the straw of Plaintiff's iced coffee cup.  Defendant Sullivan stated to Plaintiff that he should think of him (Sullivan) as he sucked on it.

17.   In addition to Defendant Sullivan's aforementioned conduct, in or about late 2012, then co-worker John Walter, a Defendant herein, engaged in extremely outrageous behavior by pulling his pants down in the locker room and making a sexual comment to Plaintiff followed by a derogatory name.

18.   In or about April 2013, inquiry was made to Plaintiff by Defendant Corning Incorporated's Human Resources Department as to the aforementioned incident with John Walter

-4-

and also an incident with Defendant Sullivan where he attempted to humiliate Plaintiff in the presence of co-workers with remarks about Plaintiff's stuttering. Plaintiff was asked and did verify that the incidents occurred. Plaintiff thereafter was not advised of the status of any investigation or outcome that resulted from his meeting.

19.   The aforementioned conduct of Defendant Sullivan continued to occur despite Plaintiff's meeting with the Human Resources Department in April 2013.

20.   In or about August 2013, there became available a position in Plaintiff's current title with better hours. Plaintiff noted his interest in said position to Supervisor Craig Jordaens. After Plaintiff expressed his desire in said position, Craig Jordaens, upon information and belief, consulted with Defendant Sullivan and noted to him Plaintiff's interest in the position.

21.   Thereafter, Mr. Jordaens advised Plaintiff that "because you stutter, we're giving the position to Jason (Horth)." Mr. Jordaens further stated to Plaintiff on this occasion, "I assumed you would be uncomfortable giving speeches." However, "giving speeches" is not an essential component of the job and upon information and belief, Defendant Sullivan only added that criterion after he learned of Plaintiff's interest in the position.  Plaintiff was denied the position because of his disability.

22.   On or about September 8, 2013, Plaintiff made a complaint through the "Ethics Point System" as provided by Defendant Corning Incorporated. A copy of said complaint is attached as Exhibit "A."  Among other things, Plaintiff noted the aforementioned interaction he had with the Human Resources Department in April 2013. Additionally, Plaintiff complained about the conduct of Defendant Sullivan which included massaging Plaintiff's shoulders, making a sexually harassing comment, and also mocking his disability.

23.   Thereafter, in September 2013, Plaintiff and other employees were asked by Corning Incorporated Employee Laurie Fagan about issues they may be having in the company. Plaintiff mentioned that he was dealing with Human Resources on separate issues but alerted her to the fact that he was not given a position because of his stutter.

24.   Approximately one week later, Plaintiff was summoned to a meeting attended by Ms. Fagan and Mr. Jordaens. Plaintiff was advised by Ms. Fagan that Mr. Jordaens was "sorry that he chose his words wrong."  Ms. Fagan suggested to Plaintiff speech therapy.

25. On or about September 12, 2013, Plaintiff met with legal counsel for Corning Incorporated in regards to his Ethics Point complaint. Plaintiff was assured that his allegations would be kept confidential and not be shared with others.

26.   On or about October 23, 2013, Plaintiff had telephone contact with Human Resources and legal counsel for Corning about their investigation into his Ethics Point complaint.  Plaintiff was advised that while some of his allegations could not be substantiated, Defendant Sullivan's actions in touching and caressing him were corroborated by numerous employees.  However, Plaintiff was further told that he "could've have been mistaken" and that Sullivan's actions were merely "fatherly" gestures.

27. As set forth above, Plaintiff engaged in multiple acts of protected activity.  Upon information and belief, said protected activity caused Defendants and other officials at Corning Incorporated to resent and distrust him.  Also, as set forth below, Plaintiff has been subjected to retaliatory acts of Defendants who doubled down in their retaliatory conduct against Plaintiff starting in or about November 2014 and continuing to present.

28.  In or about April 2014, Plaintiff came under the supervision of Defendant John

Walter who became a supervisor.  Even though Plaintiff was never given an official or unofficial completion date for his apprenticeship, Defendant Walter, in or about April 2014, stated to Plaintiff "if you don't have your license by June 2015, you'll never be a mechanic at Corning." A couple weeks later, Defendant Walter stated to Plaintiff that "if you don't have your license by April 2015, you'll never be a mechanic at Corning."

29.   Between April and December 2014, Plaintiff at various times would request leave to take vacation as he was entitled to do so. Plaintiff withdrew multiple requests to take vacation as he was told by Defendant Walter whenever he would make such a request, "I guess you're not serious about becoming a mechanic."

30.   In early November 2014, Plaintiff made inquiry to Defendant Manchester about whether Corning Incorporated was going to permit him to attend school to secure his Airframe and Powerplant License (A&P license). Plaintiff was slated to attend such school in early December. Defendant Manchester responded with the comment, "you have to prove whether you're a giver or a taker."

31.   On December 2, 2014, Plaintiff officially applied for the position of Aviation Maintenance Technician, a position where he would be able to use his anticipated A&P license and achieve greater compensation at Corning Incorporated.  This position was traditionally available to those employees completing the apprenticeship program.

32.   In early December 2014, there was a staff meeting which was presided over by Defendant Manchester and attended by Plaintiff and co-workers of Plaintiff.  Defendant Manchester stated "we opened it up to Joe to apply but he's really going to have to impress me." Manchester was referring to the position Plaintiff was seeking, to wit:  Aviation Maintenance

Technician.  Thereafter, Defendant Manchester approached Plaintiff at his tool box and told him he could proceed with going to school.

33.  Shortly after said interaction with Defendant Manchester, Plaintiff had a meeting with Mr. Jordaens. Mr. Jordaens stated "whatever you do, don't say anything ... and you'll probably have to use your license elsewhere."

34.  On January 9, 2015, Defendant Manchester called Plaintiff at his home. Later that day, Plaintiff met with Defendant Manchester. Defendant Manchester stated to Plaintiff that Defendant Sullivan stated that they were hiring only mechanics with experience. However, Defendant Manchester also stated "if there is a third opening, you'll be considered and have a good shot at it."

35.  Historically, those who completed the apprenticeship program were given positions upon their obtaining an A&P license and therefore the experience requirement was merely a pretext to avoid selecting Plaintiff.  Upon information and belief, said requirement was devised as a way to block Plaintiff's selection because of his disability and/or protected activities.

36.  On January 9, 2015, after his contact with Defendant Manchester that day, Plaintiff was contacted by Ken Stacey, a member of the Corning Incorporated Hiring Team. He stated that they made a selection. He stated that he and Ray Ferry, another member of the Hiring Team, were very vocal in their support for Plaintiff. Mr. Stacey reported that Mr. Ferry was visibly upset, and stated that Brad Cole and David Manchester voted against Plaintiff, but the remainder of the Hiring Team voted for him. They were told that they could keep Jim Barrett, another applicant for the position, but not Plaintiff.

37.  During this conversation, Mr. Stacey apologized to Plaintiff and attributed his

(Plaintiff's) non-selection to Defendant Sullivan.

38.  Mr. Stacey reported on this occasion that Defendant Walter learned during a break that Mr. Stacey, David Cedar, and Mr. Ferry had voted to award Plaintiff the position.  At this point, Defendant Walter went into Defendant Sullivan's office and met privately with him. Defendant Sullivan then came into the Hiring Team room and advised the Hiring Team members that Plaintiff did not have the experience Kirk Gregg, Corning's Executive Vice President and Chief Administrative Officer, required.

39.  Between January 11 and January 24, 2015, Plaintiff was away attending school to get his A&P license. During this time period, Plaintiff had correspondence with Brad Cole as they were trying to cheat him on his time.

40.  On or about January 26, 2015, Plaintiff returned from school having successfully obtained his A&P license. Approximately ten (10) co-workers congratulated Plaintiff on securing his license and expressed disbelief about not getting the mechanics job. Ken Stacey, John Walter, and John Waschezyn all had gone through the apprenticeship program and were hired by Defendant Corning Incorporated as mechanics after securing A&P licenses.

41.  On January 27, 2015, Plaintiff met with Defendant Manchester in the presence of Defendant Walter. Defendant Manchester indicated that Brad Cole brought him Plaintiff's time card with overtime sought. Plaintiff asked about time spent on Saturday, to which Defendant Manchester stated "we don't pay overtime when you're out of town. It's a policy change with new management, and I'm new management."

42.  Thereafter, Plaintiff wrote an e-mail to Human Resources Representative Michael Rathbun, indicating that he was being treated differently than other employees with respect to

time and compensation, including Ken Stacey, who had previously gone through the

apprenticeship program and was compensated for his time spent in school on Saturday.  It has

always been common practice at Corning Incorporated for employees to be paid for all the time

spent in class.  Mr. Rathbun agreed that it was company policy that employees are paid for time

spent in training, regardless of the day.

43.   Later on January 27 - after the e-mail to Mr. Rathbun - Defendant Manchester called

Plaintiff into his office. Defendant Manchester stated, "did you have a problem with the answer I

gave you?" "I don't know who you think you are, but you are free to take your license and walk

out the door."  In response, Plaintiff stated that he really wasn't interested in getting paid the

overtime but noted that he did need a day off.  Plaintiff was looking for a day to rest having just

returned from school.  Defendant Manchester stated, "While you were away, we changed the

policy, you can no longer use comp time."  Plaintiff then stated, "I'll take an unpaid day," to

which Defendant Manchester responded "you can't do that, you have to use your vacation time."

Plaintiff told Defendant Manchester that vacation time had already been disapproved, and

Defendant Manchester had no real response. This forced Plaintiff to refrain from taking any time

off and sent a clear message to him and others that Plaintiff was being targeted.

44. On February 4, 2015, Plaintiff met with Mr. Rathbun. Plaintiff complained about

retaliation and Mr. Rathbun stated that he spoke with Defendant Sullivan and that he (Mr.

Rathbun) had a lot of experience in Human Resources and didn't see it.

45.   On February 8, 2015, Plaintiff, Scott Ray and Sid Spencer all put in for emergency

pay. They were called in two hours earlier than scheduled. Emergency pay is twice the average

rate of pay. Plaintiff and Mr. Ray e-mailed payroll to figure out how to log in emergency pay.

Payroll responded back by copying Defendant Manchester.

46.   During the week of February 8, 2015, there was a group meeting. Defendant Walter stated that Plaintiff and the other two employees "stole from Corning." Even though Defendant Walter acknowledged that they had used the right code, he stated that they cannot collect emergency pay because they are "on call 24/7." Mr. Ray, Mr. Spencer, and Plaintiff responded. Plaintiff stated that they were asked to come in early. Defendant Walter stated "anytime you go outside the department there will be consequences." Mr. Spencer left the meeting disgusted.

47.   Immediately thereafter, it was announced that the company was no longer going to pay for lunch time, abandoning a sixty year practice of paying employees for lunch. Brad Cole told employees that the reason they were no longer going to get paid lunches was because of Plaintiff and Mr. Ray and Mr. Spencer.

48.   A couple of days later, Mr. Spencer was called into Defendant Manchester's office and asked to explain why he walked out. He said he didn't appreciate being called a thief. Mr. Spencer brought up how they were mistreating Plaintiff, which he stated made him sick.

49.   Approximately one week later, there was a group meeting where John Waschezyn voiced disagreement with how Plaintiff was being treated and did so in the presence of Defendants Manchester and Sullivan.

50.   On March 3, 2015, Mr. Ferry interjected himself in a conversation and stated to Plaintiff in the presence of co-workers, Donald Yearick and Homer Northup, "Monte is behind you not getting this job."

51.   On March 5, 2015, a co-worker stated to Plaintiff "you won't be getting the position because you pissed them off by going uptown."

52. On March 8, 2015, Mr. Ferry stated to Plaintiff that he would be more than willing to talk to Defendant Sullivan but only if Plaintiff first apologized to him (Defendant Sullivan) for making his complaint.  Mr. Ferry further stated to Plaintiff, "You will have to suck up your pride."  Plaintiff's protected activity clearly was and is the but-for cause of his non-selection to a position whereby he could utilize his A&P license and thus unlawful.

53. On March 10, 2015, Defendant Walter reported that Mr. Rathbun and him were working on a deal behind Defendants Manchester's and Sullivan's back to get Plaintiff a position or an extended apprenticeship as they acknowledged that Plaintiff is being treated disparately and unfairly.  Further, despite the availability of positions and Defendant Manchester's assurance to Plaintiff that he had a "good shot," Plaintiff has been totally blocked from consideration for employment beyond his current position and denied the use of his A&P license at Corning Incorporated.

54. In sum, Plaintiff Joseph McIntyre has been refused a position whereby he is able to use his A&P license.  Upon information and belief, said adverse employment action is due to disability and/or protected activity.  Further, Plaintiff's work environment has been strained as employees are reluctant to even speak with him for fear of being retaliated against too.

55. Defendants have caused Plaintiffs harm, injury and damage, including but not limited to:

    (a)    Plaintiff Joseph McIntyre has been deprived of income in the form of wages, promotional opportunities and job positions and assignments which were made or denied because of Plaintiff's disability and/or gender and/or in retaliation for protected activity;

(b)     Plaintiff Joseph McIntyre has suffered physical harm in the form of

tension, headaches, stomach aches, sleeplessness, nervousness, anxiety,

fear and dread, extreme anxiety, embarrassment, humiliation, degradation,

stress, depression, insomnia, anger, fear, family discord and dysfunction,

stomach upset, and pain.

(c)     Plaintiff Joseph McIntyre has been forced to suffer severe emotional

distress, mental anxiety, depression, and psychological trauma;

(d)     Plaintiff Joseph McIntyre has been denied equitable employment

compensation, equitable employment terms and conditions and privileges

of employment because of his disability and/or gender and/or in retaliation

for protected activity;

(e)     Plaintiff Joseph McIntyre has been subjected to damage to his good name,

humiliation, indignity and shame;

(f)     Plaintiff Joseph McIntyre has suffered injury to his family and community

relations amongst his peers and co-workers;

(g)     Plaintiff Anne McIntyre's marital life and relationship with her husband

has been negatively affected and altered due to the Defendants' unlawful

actions;

(h)     Plaintiffs have been caused to incur legal fees and medical expenses; and

(i)     Plaintiffs have been otherwise damaged.

## AS AND FOR A FIRST CAUSE OF ACTION FOR DISABILITY DISCRIMINATION IN VIOLATION OF THE REHABILITATION ACT

56.  Plaintiffs restate and re-allege paragraphs 1 through 55 as if fully stated herein.

57.  Upon information and belief, Defendant Corning Incorporated is a recipient of Federal financial assistance and government contracts.

58.  Plaintiff Joseph McIntyre was discriminated against on the basis of having a disability and/or being regarded as having a disability in violation of the Rehabilitation Act. *Inter alia*, Plaintiff Joseph McIntyre has been denied positions due to disability as well as subjected to a hostile work environment due to disability.

59.  Plaintiff suffered injury and harm as a result of the conduct of Defendants as set forth in more detail above and is entitled to compensation therefor.

## AS AND FOR A SECOND CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF THE REHABILITATION ACT

60.  Plaintiffs restate and re-allege paragraphs 1 through 59 as if fully stated herein.

61.  Upon information and belief, Defendant Corning Incorporated is a recipient of Federal financial assistance and government contracts.

62.  Plaintiff Joseph McIntyre was retaliated against for engaging in protected activity, in violation of the Rehabilitation Act.  *Inter alia*, Plaintiff Joseph McIntyre has been denied positions because of his protected activity as well as subjected to a retaliatory work environment.

63.  Plaintiff suffered injury and harm as a result of the conduct of Defendants as set forth in more detail above and is entitled to compensation therefor.

-14-

## AS AND FOR A THIRD CAUSE OF ACTION FOR
## GENDER DISCRIMINATION IN VIOLATION OF THE NEW YORK
## STATE HUMAN RIGHTS LAW

64.  Plaintiffs restate and re-allege paragraphs 1 through 63 as if fully stated herein.

65.  Plaintiff Joseph McIntyre was discriminated against on the basis of his gender in the form of a hostile work environment, in violation of the New York Human Rights Law.

66. Plaintiff suffered injury and harm as a result of the conduct of Defendants as set forth in more detail above and is entitled to compensation therefor.

## AS AND FOR AN FOURTH CAUSE OF ACTION FOR
## DISABILITY DISCRIMINATION IN VIOLATION OF THE
## NEW YORK STATE HUMAN RIGHTS LAW

67.  Plaintiffs restate and re-allege paragraphs 1 through 66 as if fully stated herein.

68.  Plaintiff Joseph McIntyre was discriminated against on the basis of his disability, in violation of the New York Human Rights Law.  *Inter alia*, Plaintiff Joseph McIntyre has been denied positions due to disability as well as subjected to a hostile work environment due to disability.

69.  Plaintiff suffered injury and harm as a result of the conduct of Defendants as set forth in more detail above and is entitled to compensation therefor.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR
## RETALIATION IN VIOLATION OF THE NEW YORK STATE
## HUMAN RIGHTS LAW

70.  Plaintiffs restate and re-allege paragraphs 1 through 69 as if fully stated herein.

71.  Plaintiff Joseph McIntyre was retaliated against for engaging in protected activity, in violation of the New York Human Rights Law.  *Inter alia*, Plaintiff Joseph McIntyre has been denied positions because of his protected activity as well as subjected to a retaliatory work

environment.

72.  Plaintiff suffered injury and harm as a result of the conduct of Defendants as set forth

in more detail above and is entitled to compensation therefor.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR
## BREACH OF CONTRACT

73.  Plaintiffs restate and re-allege paragraphs 1 through 72 as if fully stated herein.

74.  Under the terms of Defendant Corning's Code of Conduct, it agreed to refrain from

taking any action against an employee for raising in good faith issues involving  violations of the

company's Code of Conduct.

75.  The consideration Corning receives for making such promise is the receipt of

information from employees concerning violations of its Code of Conduct.  A valid and binding

contract between Plaintiff and Defendant Corning thereby existed.

76.  Plaintiff duly performed his part of the contractual bargain in that he made

complaints/reports raising in good faith issues involving violations of Corning's Code of

Conduct.  Specifically, Plaintiff complained and reported violations of the Code of Conduct

which expressly condemn "any form of discrimination or harassment."

77.  Defendant Corning did not perform its part of the contractual bargain in that it

subjected Plaintiff to retaliatory action for his good faith complaints/reports.

78. Plaintiff suffered injury and harm as a result of the conduct of Defendant Corning

Incorporated as set forth in more detail above and is entitled to compensation therefor.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR
## PROMISSORY ESTOPPEL

79.  Plaintiffs restate and re-allege paragraphs 1 through 78 as if fully stated herein.

-16-

80.  By the terms of Defendant Corning's Code of Conduct, it made a clear and unambiguous promise to refrain from taking any action against an employee for raising in good faith issues involving violations of the company's Code of Conduct.

81.  It was reasonable and foreseeable to Defendant Corning that its promise of non-retaliation would induce employees to make complaints and reports of violations of Corning's Code of Conduct.

82.  To his detriment, Plaintiff reasonably relied upon Defendant Corning's promise of non-retaliation in complaining and reporting violations of Corning's Code of Conduct.

83.  Plaintiff suffered injury and harm as a result of his reliance of Defendant Corning's promise as set forth in more detail above and is entitled to compensation therefor.

## AS AND FOR AN EIGHTH CAUSE OF ACTION FOR
## LOSS OF CONSORTIUM

84.  Plaintiffs restate and re-allege paragraphs 1 through 83 as if fully stated herein.

85.  Plaintiff Anne McIntyre's marital life and relationship with her husband has been negatively affected and altered due to the Defendants' actions against Plaintiff Joseph McIntyre. As such, she is entitled to damages for loss of consortium.

86.  Defendants' actions against Plaintiff Joseph McIntyre have affected Plaintiff Anne McIntyre's social and family life inasmuch as her happiness and general welfare have been disturbed. *Inter alia*, she has been deprived of her husband's comfort and companionship and suffered disruption to her daily life.

87.  Plaintiff Anne McIntyre has suffered harm and injury from the Defendants' actions and is entitled to compensation therefor.

**WHEREFORE**, Plaintiffs respectfully request that this court assume jurisdiction herein and thereafter:

1.  Award Plaintiffs appropriate compensatory and punitive damages in an amount to be defined and determined at the trial of this matter but no less than the sum of $1,000,000.00;

2.  Award disbursements and costs of this action;

3.  Grant the Plaintiffs injunctive and declaratory relief, including a declaratory judgment finding Defendants violated the rights of the Plaintiffs and precluding Defendants from so acting against others in the future;  and

4.  Award such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial for all claims stated herein.


Dated: May 5, 2015
at Rome, New York

s/A.J. Bosman

_____
   A.J. Bosman, Esq.

Bosman Law Firm, L.L.C.
*Attorneys for Plaintiffs*
Office and Post Office Address:
6599 Martin Street
Rome, New York 13440
Telephone: (315) 336-9130

# EXHIBIT "A"

EthicsPoint

**ethics·point**

You are now in an EthicsPoint Secure Area | **File a Report**



### YOUR REPORT KEY IS:
2456091463

**Write this down and keep this in a safe place!**
You will need your report key and the password you selected to check on your report in the future or to make a follow-up.



## PLEASE ALLOW 20 BUSINESS DAYS FOR PROCESSING AND REVIEW

Begin checking after 20 business days and then continue to check periodically to see if the organization has any additional questions for you to answer regarding your report.

## HOW TO FOLLOW-UP ON A REPORT



OR

Go to www.ethicspoint.com

Call our toll-free hotline at
1-866-ETHICSP

Return to EthicsPoint home.

Copyright © 2000-2013 EthicsPoint, Inc. All Rights Reserved
Privacy Policy | Safe Harbor Information | Acceptable Use Policy | Contact Us | Site Map

https://secure.ethicspoint.com/domain/en/report_information.asp

9/8/2013

EthicsPoint

# ethics·point

You are now in an EthicsPo

**ETHICSPOINT IS <u>NOT</u> A 911 OR EMERGENCY SERVICE.**
Do not use this site to report events presenting an immediate threat to life or property. Reports s
service may not receive an immediate response. If you require emergency assistance, please c.
authorities.

☐ * Yes - I agree to the <u>Terms and Conditions</u> of making this report.

## Please provide information as follows:

( * Required fields )

Organization/Tier: **Corning Incorporated**

Location where
incident occurred:

City:   State/Province:

Zip/Postal Code:

Country: United States

* **Are you an employee of Corning Incorporated?**

◌ Yes    ◌ No

**Corning does not encourage employees to report Code of Cond
anonymously. It is harder to gather information and thus to inve
anonymous reports and Authorities in the European Union have
anonymous reporting.**

* **Do you wish to remain ANONYMOUS for this report?**

◌ Yes    ◌ No

**If you want Corning Incorporated to know your identity, please o
following:**

Your Name: | Joseph | McIntyre
--- | --- | ---
 | First Name | Last Name

Your Phone Number:

Your E-mail Address:

Best time for communication with you:

Usually Mornings or early afternoons.

**Report - Discrimination or Harassment**

***Please identify the person(s) engaged in this behavior:**

Example:

EthicsPoint

John Doe, Director of Internal Audit
Unknown, Unknown, Night Supervisor

| | First Name | Last Name | | Title |
|---|---|---|---|---|
| #1 | Monty | Sullivan | - | Chief Pilot |
| #2 | | | | |
| #3 | | | | |

**Do you suspect or know that a supervisor or management is inv**

◉ Yes   ◉ No   ◉ Do Not Know / Do Not Wish To Disclose

If yes, then who?

_____

Example:

John Doe, I
Audit

Any persons mentioned here will be restricted by
EthicsPoint from access to this reported information.

**Is management aware of this problem?**

◉ Yes   ◉ No   ◉ Do Not Know / Do Not Wish To Disclose

**What is the general nature of this matter?**

Uncomfortable Physical Contact and innapropriate
comments.

This should be a general description only, you will be
asked for specifics later.

**Where did this incident or violation occur?**

Corning Incorporated Aviation Department Hangar,
Horseheads, NY

We recognize that this incident may not have occurred in
a particular location. However, if this incident was
observed in some documentation or business
transactions, please indicate this accordingly.

**Please provide the specific or approximate time this incident oc**

Multiple times over the last few months

Examples:

Tuesday, May 3
Two weeks ago
Approximately a

**\*How long do you think this problem has been going on?**

1 to 3 months

**\*How did you become aware of this violation?**

It happened to me

If other, how?

EthicsPoint

**Please identify any persons who have attempted to conceal this**
**steps they took to conceal it:**

Examples:

Ignored it
Changed docum
Said it was not a
Said they would

Please identify by name and title.

**\* Please provide all details regarding the alleged violation, inclu**
**locations of witnesses and any other information that could be v**
**evaluation and ultimate resolution of this situation.**

This matter in which I am about to describe was first brought up to
Corning Human Resources during an unrelated investigation in which I
was asked to verify information for them. I have not heard back from
either representative I spoke with from the HR or Legal Department
within Corning regarding the matter, so I am unaware if it was
addressed or the status of any investigation that resulted from that
meeting. At the end of the meeting, I was informed by Daniel Christmas
and Mario Scarselletta , that submitting a report on this website was an
alternative method of reporting violations of Corning's Code of Conduct,
if I felt my complaints would be ignored or feared retaliation.
In that meeting, I was asked to verify for the Human Resources and the
Legal Department representative, a complaint that my former
supervisor, Donald Yearick, had reported. He reported that another co-
worker, John, pulled their pants down in the locker room and made a
sexual statement to me followed by a derogatory name. I verified it

When you submit the report, you will be issued a Report Key. Please write
in a safe place. We ask you to use this Report Key along with the password
to return to EthicsPoint through the website or telephone hotline in 20 bus
returning in 20 business days, you will have the opportunity to review any
Questions or submit more information about this incident.

**Please choose a password for this report:**

\* Password:

\* Re-enter
Password:

**Your passwords must match and be at least four characters long.**

[ Submit Report ]

Copyright © 2000-2013 EthicsPoint, Inc. All Rights Reserved
Privacy Policy | Safe Harbor Information | Acceptable Use Policy | Contact Us | Site

This matter in which I am about to describe was first brought up to Corning Human Resources during an unrelated investigation in which I was asked to verify information for them. I have not heard back from either representative I spoke with from the HR or Legal Department within Corning regarding the matter, so I am unaware if it was addressed or the status of any investigation that resulted from that meeting. At the end of the meeting, I was informed by Daniel Christmas and Mario Scarselletta , that submitting a report on this website was an alternative method of reporting violations of Corning's Code of Conduct, if I felt my complaints would be ignored or feared retaliation.

In that meeting, I was asked to verify for the Human Resources and the Legal Department representative, a complaint that my former supervisor, Donald Yearick, had reported. He reported that another co-worker, John, pulled their pants down in the locker room and made a sexual statement to me followed by a derogatory name. I verified it happened, and I also let them know that I reported to my supervisor, Craig,  that I was being retaliated against by this same coworker, John,  telling coworkers I could not be trusted, to which Craig responded, " That's not possible". Two weeks ago, I also spoke to the same supervisor, Craig, and told him that I had been approached by members of a different work group, who had also heard about the incident. I was told that the 'leak' was not from our department. It is difficult to put that incident behind me, when it is allowed to be verbally spread and discussed.

 I was also asked to verify a complaint in the meeting with HR/Legal that Monty Sullivan, attempted to humiliate me in the presence of coworkers with remarks about my stuttering, which is a speech impediment I have had throughout my life. I informed them that that had happened as well.


I have been approached from behind and had my shoulders massaged numerous times both while alone and while in the presence of other coworkers by Monty Sullivan. He has asked me at least once if I am uncomfortable and I have stated yes. I have been startled and yelled at least once when I was startled by this approach. My bodily reactions to lean away, scrunch up my shoulders, to trying to wiggle away also should have made it clear that I am uncomfortable. I have begun to walk away if I see him coming and his behavior has also caused me to avoid being alone in certain areas of the workplace when I believe he may be coming through, and even having other people there does not seem to help me avoid this from occurring. It does become humiliating when my coworkers ask me why he is always rubbing me. This pattern has become increasing more frequent and I seem to be the only target.  I cannot figure out why he does this other than to try to intimidate me. A few weeks ago, on August 8th, he made a comment in regards to himself licking the straw of my iced coffee cup and told me to think of him while I sucked on it. Comments such as that make me extremely uncomfortable due to his position. I feel this type of physical contact and comments are in direct violation of the Code of Conduct policy we , as employees, have read and signed.

I have begun to feel anxious and uncomfortable each day as the clock nears the time I go to in to work.

I do not know who to report these violations to without placing myself in a position to be retaliated against.

This matter in which I am about to describe was first brought up to Corning Human Resources during an unrelated investigation in which I was asked to verify information for them in April 2013. I have not heard back from either representative I spoke with from the HR or Legal Department within Corning regarding the matter, so I am unaware if it was addressed or the status of any investigation that resulted from that meeting. At the end of the meeting, I was informed by Daniel Christmas and Mario Scarselletta , that submitting a report on this website was an alternative method of reporting violations of Corning's Code of Conduct, if I felt my complaints would be ignored or feared retaliation.

In that April meeting, I was asked to verify for the Human Resources and the Legal Department representative, a complaint that my former supervisor, Donald Yearick, had reported. He reported that another co-worker, John, pulled their pants down in the locker room and made a sexual statement to me followed by a derogatory name. I verified it happened, and I also let them know that I reported to my supervisor, Craig,  that I was being retaliated against by this same coworker, John,  telling coworkers I could not be trusted, to which Craig responded, " That's not possible". Two weeks ago, I also spoke to the same supervisor, Craig, and told him that I had been approached by members of a different work group, who had also heard about the incident. I was told that the 'leak' was not from our department but it had indeed been 'leaked'. It is difficult to put that incident behind me, when it is allowed to be verbally spread and discussed.

After Donald Yearick reported the locker room incident, I was told I had to meet up with the Aviation Department Manager, the Director of Maintanience (Craig), and a Human Resource representative (Mike Rathbun). I verified for them what had taken place and said I just wanted it to go away and would appreciate if it didnt happen again. At that point, I was given two options: John and I could work on our relationship, or I could take it as a joke that 'fell flat'. I chose the latter. Not long after that, John replaced Donald as my direct supervisor. I told Craig I wasnt comfortable being placed in the situation after what had transpired in the locker room and he told me that John would treat me fairly. I made a verbal complaint to Craig in his office a short time later, informing him that John had begun questioning my coworkers about my scheduale, my hours and my vacation time. I was informed that instead of asking me directly about any concerns John may have had, John was correct in his method of asking coworkers.

 I was also asked to verify a complaint in the April 2013 meeting with HR/Legal that Monty Sullivan, attempted to humiliate me in the presence of coworkers with remarks about my stuttering, which is a speech impediment I have had throughout my life. I informed them that that had happened as well.

I have been approached from behind and had my shoulders massaged numerous times both while alone and while in the presence of other coworkers by Monty Sullivan. He has asked me at least once if I am uncomfortable and I have stated yes. I have been startled and yelled at least once when I was startled by this approach. My bodily reactions to lean away, scrunch up my shoulders, to trying to wiggle away also should have made it clear that I am uncomfortable. I have begun to walk away if I see him coming and his behavior has also caused me to avoid being alone in certain areas of the workplace when I believe he

may be coming through, and even having other people there does not seem to help me avoid this from occurring. It does become humiliating when my coworkers ask me why he is always rubbing me. This pattern has become increasing more frequent and I seem to be the only target. I cannot figure out why he does this other than to try to intimidate me. A few weeks ago, on August 8th, he made a comment in regards to himself licking the straw of my iced coffee cup and told me to think of him while I sucked on it. Comments such as that make me extremely uncomfortable due to his position. I feel this type of physical contact and comments are in direct violation of the Code of Conduct policy we , as employees, have read and signed.

I have begun to feel anxious and uncomfortable each day as the clock nears the time I go to in to work.

I do not know who to report these violations to without placing myself in a position to be retaliated against.