# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

JOSEPH McINTYRE and ANNE McINTYRE,

<div style="text-align:center">Plaintiffs,</div>

-vs-

CORNING INCORPORATED, CLAUDE SULLIVAN, DAVID
MANCHESTER, JOHN WALTER, JOHN DOE(S), and JANE
DOE(S),

<div style="text-align:center">Defendants.</div>

DECISION AND ORDER

15-CV-6277 CJS-MWP

_____

## APPEARANCES

For Plaintiffs:                    A.J. Bosman, Esq.
                                   Bosman Law Firm LLC
                                   201 W. Court Street
                                   Rome, NY 13440
                                   (315) 336-9130

For Defendants:                    Joseph A. Carello, Esq.
                                   Marion Blankopf, Esq.
                                   Stephen J. Jones, Esq.
                                   Nixon Peabody LLP
                                   1300 Clinton Square
                                   Rochester, NY 14604
                                   (585) 263-1000

## INTRODUCTION

**Siragusa, J.** This employment discrimination case is before the Court on Defendants'
motion for summary judgment, filed on October 29, 2018, ECF No. 25. Following its review of
the papers and oral argument, the Court grants in part and denies in part the application.

## FACTUAL BACKGROUND

The Court will base its factual background on the parties' submissions and indicate
where they have identified factual disputes.

*The Parties and Plaintiff's Hiring*

Corning Incorporated ("Corning" or "the company") is a company headquartered in Corning, New York, and conducts business worldwide. The company maintains and operates several aircraft primarily kept in two hanger facilities located in Horseheads, New York. Corning employs twenty-two pilots, seven to ten mechanics, and three line technicians to fly, service and maintain the aircraft. All work in Corning's Aircraft Operations department ("CAO").

Corning hired Plaintiff, Joseph McIntyre ("McIntyre"), as a line technician in June 2008.[1] McIntyre contends he applied for the position in 2007 and was not initially hired because of his stuttering disability.[2] A CAO line technician fuels aircraft, loads and unloads luggage from aircraft, and maintains the appearance and cleanliness of the airport facilities. McIntyre disputes that line technicians tow aircraft on runways, or de-ice aircraft or runways, and maintains he performed additional duties, including cleaning the interior of aircraft, washing and polishing aircraft exteriors, and special duties as assigned.

Corning hired John Walter ("Walter"), a co-defendant, in 1989. He has been a mechanic since 1992 and was the chief inspector for the maintenance department for several years. As chief inspector, he needed an advanced license above his aircraft mechanic license. Walter has been the CAO Supervisor of Maintenance since November 1, 2014. His responsibilities include ensuring that Corning's aircraft are properly maintained, and that CAO's maintenance personnel are properly trained. Walter was McIntyre's second-level

_____

[1] Although this case has two plaintiffs, both named McIntyre, the Court's primary references are to Joseph McIntyre. Anne McIntyre makes a derivative claim for loss of consortium which the Court discusses separately, below.

[2] In *Preacely v. Schulte Roth & Zabel*, 17 Fed. App'x 57, 59 (2d Cir. 2001), the Court of Appeals held that at least under the factual circumstances in that case, stuttering was not a qualifying disability under the Americans with Disabilities Act. Corning has assumed only for the purposes of the pending motion that McIntyre's stutter qualifies as a disability under federal and state law. Def.s' Mem. of Law 8 n.13, Oct. 29, 2018, ECF No. 25-12.

supervisor from November 1, 2014, until McIntyre resigned on August 3, 2015. From July 1, 2013, until November 1, 2014, Walter was the CAO night shift supervisor and in that position was McIntyre's first-level supervisor.

Walter was a member of the hiring committee that interviewed McIntyre for his line technician position in 2007 and 2008, as well as a member of the committee that interviewed applicants for mechanic's positions in 2015. McIntyre shared with the committee in 2007 and 2008 that he had a stutter. He alleges that CAO's former director of maintenance, Joseph Perino, did not hire McIntyre in 2007 because of his stutter. McIntyre further alleges that he had six years of aviation experience in 2007 when he applied for the line technician position with CAO and that the other two candidates had no aviation experience. After interviewing McIntyre in 2008, Walter hired him for a line technician position with CAO.

Co-defendant David Manchester ("Manchester") became CAO's Director of Maintenance on November 1, 2014 and held that position until he retired in April 2018. As director of maintenance, Manchester was responsible for the maintenance department's overall budget, scheduling, staffing, and operational process. McIntyre asserts that Manchester lacked the requisite mechanic certificate with airframe and power plant ratings. Manchester was a pilot at Corning both before and while he was director of maintenance.

Co-defendant Claude Sullivan ("Sullivan") became CAO's Director of Aircraft Operations in April 2014. He is also a pilot at Corning, oversees the pilots and maintenance staff, and is responsible for the overall safety of Corning's aircraft operations.

Neither Sullivan nor Manchester had any managerial or supervisory responsibility over McIntyre until April 2014. McIntyre, though, alleges that pilots were considered to be in control of their aircraft even on the ground and gave orders to line technicians.

Other than on a temporary basis, Walter did not become McIntyre's supervisor until he became the CAO night shift supervisor in early July 2013.

*Plaintiff's Mechanic Training*

After being hired as a line technician, McIntyre expressed an interest in learning to become a Federal Aviation Administration ("FAA") licensed aircraft mechanic. CAO mechanics repair the aircraft. The licensing process involves three written and one oral examination as well as completion of various mechanical, mathematical, troubleshooting, and research taskings. Generally, preparation for the licensing includes many months of practical training or attendance at a full-time school for aircraft mechanics. CAO management permitted McIntire to obtain the practical training by allowing him to periodically perform mechanic tasks under supervision while he remained employed as a full-time line technician. Per CAO procedures, a licensed mechanic was required to inspect and verify any mechanic work McIntyre performed.

After Manchester became Director of Maintenance in November 2014, he eventually agreed to permit McIntyre to continue his practical training at CAO. Manchester authorized Corning to pay approximately $8,000.00 for McIntyre's travel and wages to permit him to attend a two-week review course for the FAA examination at the Baker School of Aeronautics in Nashville, Tennessee, in January 2015.

*Plaintiff's Claim for Denial of a Mechanic Position*

In late 2014, before McIntyre took any FAA examinations, two of CAO's experienced mechanics announced their intentions to retire, as did the prior Director of Maintenance, who was also an experienced aircraft mechanic. Each possessed over thirty years of aircraft mechanic experience. Corning posted a notice for the two aircraft mechanic positions in November 2014, which anticipated hiring suitable candidates in December 2014. The job

posting required candidates for the positions to have at least three years of aircraft mechanic experience.

McIntyre contends that he was assured, but fails to mention by whom, that he would become an aircraft mechanic at CAO once he passed his FAA examination, and that he was fully qualified for either of the two positions. He applied to fill one of the two positions, although at the time he applied, he did not yet have his FAA license.

Manchester was the hiring manager for the aircraft mechanic positions and he agreed that McIntyre could be interviewed for the position, notwithstanding that he, according to Manchester, did not meet the minimum requirements of a license and three years of experience. McIntyre asserts that it was Sullivan, Manchester's boss, who eventually directed Manchester to have the hiring team select another candidate, not McIntyre, for the position. McIntyre further alleges the following:

> In early December 2014, there was a staff meeting which was presided over by Defendant Manchester which Plaintiff attended. Defendant Manchester stated[,] "we opened it up to [McIntyre] to apply but he's really going to have to impress me." Manchester was referring to the position Plaintiff was seeking, to wit: Aviation Maintenance Technician. Thereafter, Mr. Jordaens[3] approached Plaintiff at his tool box. Mr. Jord[ae]ns made it known to Plaintiff at that time, that he had no chance at ever being a mechanic at Corning. He advised Plaintiff "Keep your mouth shut and don't question anything. Let them pay for you to take your test. You'll have to use your license elsewhere."

Pl.'s Statement of Disputed Material Facts ¶ 45, Feb. 12, 2019, ECF No. 35-2.

CAO's hiring committee consisted of mechanics, supervisors, a pilot, a human resources representative, and Manchester. The committee interviewed the six candidates who applied and used a ranking system provided by the human resources representative to rate each candidate in functional skill sets and recorded the results on a Decision Analysis

---

[3] Craig Jordaens was the prior Director of Maintenance, who was also retiring from Corning.

Summary form. Three of the applicants outscored McIntyre. Walter, who was a member of the hiring committee, scored McIntyre lower than the other candidates on his functional skill set, since he believed McIntyre lacked the necessary mechanic experience compared to the other candidates, who were experienced aircraft mechanics with many years of experience. McIntyre responds:

> When the hiring committee conveyed [sic], John Walter and Dave Manchester went across the hall to Defendant Sullivan's office before the final decision was made. When they returned, it was announced that Sullivan said Kirk Gregg[4] wanted more experience than they felt Plaintiff possessed and that he was not able to be selected. They were directed to select another candidate.

Pl.'s Statement of Disputed Material Facts ¶ 50. Corning states that the hiring committee provided Manchester with their top candidates. McIntyre asserts, "Defendant Manchester also refused to accept letters of recommendations from mechanics in the department who wrote letters on the Plaintiff's behalf. At times he became angry when presented with such letters." *Id*. ¶ 51. Manchester made the hiring decision, although McIntyre contends that Sullivan directed Manchester not to hire him.

Manchester expressed the opinion that previous work experience as an aircraft mechanic was a critical requirement for the open positions because Corning was losing very experienced mechanics. In January 2015, Manchester offered the positions to two candidates ranked as the top two by the hiring committee. In addition to experience as an aviation mechanic, Barrett, previously worked as an avionics[5] manager for over ten years and as a part-time avionics mechanic for another seven years. The other candidate, Pulka, had over twenty years of prior experience as an aircraft mechanic and was a crew and shift leader.

---

[4] Plaintiff identifies Kirk Gregg as the executive in charge of overseeing the aviation department. Pl.'s Statement of Disputed Material Facts ¶ 52.

[5] Avionics is an advanced subspecialty of aircraft mechanics involving repair of electronic aircraft components.

*The Apprenticeship Program Offered by Corning*

On January 9, 2015, prior to McIntyre's departure for his FAA license review course, Manchester told him that he had not received the position because of his lack of experience and then-current lack of a license. McIntyre responds:

On January 9, 2015,

Defendant Manchester advised Plaintiff that he would not be getting the position. He said "Monty" (Defendant Sullivan) and Kirk Gregg (the executive in charge of overseeing the aviation department) wanted more experience than they felt Plaintiff had. (McIntyre Affm.,). The Plaintiff was already advised that the former Director of Maintenance, Craig Jord[ae]ns that as of December 2014 Plaintiff had no chance at ever being a mechanic at Corning. He advised Plaintiff "Keep your mouth shut and don't question anything. Let them pay for you to take your test. You'll have to use your license elsewhere."

*Id*. ¶ 57. Manchester told McIntyre he would need to obtain experience as a licensed aircraft mechanic before he would be considered for that position at CAO. McIntyre disputes this and contends that Manchester, instead, told him he could take his test, but would need to seek employment as an aircraft mechanic elsewhere. *Id*. ¶ 58. Around March 5, 2015, Manchester offered to provide McIntyre with a formal mentoring program, so he could gain experience while still holding his line technician job. McIntyre adds that Manchester did not promise him an aircraft mechanic position and advised McIntyre he shouldn't expect one. *Id*. ¶ 60. McIntyre passed the FAA examination and obtained his aircraft mechanic's license at the end of January 2015.

Candidate Barrett accepted Corning's offer, but Pulka turned it down. Corning then sought two more aircraft mechanics through a job posting in February 2015. The posting required either three or five years of experience as well as the FAA license. Corning states the requirement was three years, and McIntyre states it was five, which he argues was done to ensure his exclusion from consideration. Nevertheless, McIntyre applied for one of the two positions. Manchester had a human resources representative inform McIntyre that he did not

qualify due to lack of work experience (McIntyre contends he had to contact the human resources department to obtain that information). *Id*. ¶ 65.

The same hiring committee ranked the new candidates, and positions were offered to the two highest: Jeff Allen ("Allen") and Steve Haight ("Haight"), both of which had scores above McIntyre's from the earlier process. Allen had nine years of prior experience as an aviation mechanic and was a director of maintenance. Haight had over thirteen years of prior experience as an aircraft mechanic. Each accepted Corning's offer. McIntyre adds that Allen resigned a couple of weeks after he began working for Corning. *Id*. ¶ 71.

Corning states that McIntyre has admitted he was not more qualified for the aircraft mechanic openings than were Barrett, Pulka, Allen, or Haight. In his response, McIntyre contends that he was *as* qualified as the candidates chosen by the selection committee. At his deposition, McIntyre was asked the following questions and gave the following responses:

Q. Do you believe that you were—do you believe that you were more qualified than Jim Barrett?

MS. BOSMAN: I'm sorry, who?

MR. JONES: Jim Barrett.

MS. BOSMAN: Barrett.

A. Qualified, no.

Q. Do you believe you were more qualified than John Pulka?

A. Qualified, no.

Q. Do you believe you were more qualified than Steve Haight?

A. No.

Q. Do you believe you were more qualified than Jeff Allen?

A. No.

McIntyre Dep. 180:14–181:5, *attached as* Ex. B, ECF No. 25-3, to Jones Aff., Oct. 29, 2018, ECF No. 25-1.

Although McIntyre suffered from stuttering, Corning states that no evidence shows that either Manchester or Walter were biased against him as a result. McIntyre responds that Sullivan made fun of McIntyre's stuttering, and he was the one who directed Manchester to have the hiring committee select someone other than McIntyre. Pl.'s Statement of Disputed Material Facts ¶ 74. Manchester never made any derogatory or negative remarks about McIntyre's stuttering, nor does McIntyre contend that Walter ever made a derogatory or negative remark about his stuttering within McIntyre's hearing.

Corning states that no evidence has been revealed to show that either Manchester or Walter were motivated to deny McIntyre an aircraft mechanic position because he had complained about Walter's or Sullivan's conduct in 2013. McIntyre disputes this statement and responds as follows:

> Sullivan, who the subject of complaints by or involving Plaintiff, was Manchester's boss and he directed Manchester to have the hiring team select someone other than Plaintiff for the position. (McIntyre Affm.). As of November 1, 2014, Manchester reported to Sullivan. Defendant Manchester reported to Defendant Sullivan directly in the past as well, when Manchester was a pilot and Sullivan was Chief Pilot. Further, Manchester and Sullivan are friends and have a long history of taking trips together on the company aircraft with their families. (McIntyre Affm.). Dave Manchester told Sid Spencer before his termination/retirement in February 2015 that Plaintiff would never a mechanic at Corning.

Pl.'s Statement of Disputed Material Facts ¶ 77.

Corning's ranking system for new hires had been introduced in mid-2014 by its corporate human resources department for use throughout the company in the United States. Before he became director of maintenance on November 1, 2014, Manchester had not hired any aircraft mechanics for Corning. His hires in January and March 2015 were his first.

In March 2015, after McIntyre's return from his review course, Manchester did in fact offer to set up a formal mentoring program for McIntyre, so that he could gain experience as an aircraft mechanic while still holding his full-time job as a line technician at CAO. Under the devised program, McIntyre would spend twenty hours per week working on mechanic tasks under the mentorship of one of CAO's experienced mechanics. Corning intended to hire a temporary line technician to backfill McIntyre's work, while he was undergoing training as an aircraft mechanic. McIntyre disputes this and states that he was not informed he would have a designated schedule, and that the aircraft mechanic work would be unscheduled and would require him to neglect his four children. *Id*. ¶ 84. Walter advocated for the program. In March 2015, Manchester and a human resources representative met with McIntyre to go over the proposed program and provided him with a written outline of it. However, on March 19, 2015, McIntyre notified Manchester he would not participate in the apprenticeship program, stating that he already had enough experience to be an aircraft mechanic and the program would impose a hardship on his family life. He also informed Manchester that he was looking for work outside Corning.

In April 2015, McIntyre listed his 1,000 square foot home for sale. He was expecting a fourth child in July of that year.

### McIntyre's Hostile Environment Claim

In February 2012, McIntyre's former shift supervisor informed Jordaens, the former director of maintenance, and Michael Rathbun ("Rathbun"), the CAO human resources manager, that some months earlier Walter had exposed his backside to ("mooned") McIntyre in the locker room at Corning's hanger. McIntyre adds that as he was mooning him, Walter said, "I bet you like that, don't you fag?" McIntyre Aff. ¶ 7, Feb. 12, 2019, ECF No. 35; Yearick

Aff. ¶ 7, Feb. 12, 2019, ECF No. 35-1.[6] Jordaens and Rathbun investigated, including interviewing Walter who admitted the conduct, but said it was meant as a joke and that McIntyre had taken it as such. McIntyre counters he did not laugh at the time of the mooning, and made his disgust known. Pl.'s Statement of Disputed Material Facts ¶ 94. Walter was given a verbal warning that his inappropriate behavior was not going to be tolerated and he agreed never to do it again.

In May 2013, the former shift supervisor, whom McIntyre identifies as Donald Yearick, Pl.'s Statement of Disputed Material Facts ¶ 96, mentioned the mooning incident to representatives from Corning's legal and global human resources departments during an interview regarding an unrelated matter. As a result, investigators re-interviewed McIntyre, at which time he stated that Sullivan had made fun of his stuttering a handful of times both in front of other employees and in private. Corning decided that Walter's prior verbal warning would be put in writing and again counseled him about his behavior. Sullivan denied making fun of McIntyre's stuttering, although McIntyre contends that Corning had evidence to the contrary. *Id*. ¶ 100. Neither Walter nor Sullivan supervised McIntyre at the time of these allegations of misbehavior.

In September 2013, McIntyre submitted a complaint using Corning's EthicsPoint website, one of the options for Corning employees to complain about violations of Corning's Code of Conduct. In his complaint, McIntyre alleged that Sullivan had massaged his shoulders

---

[6] Yearick's affidavit includes the following: "I witnessed John Walter bully Joe and call him names including 'Fag' numerous times, and I complained to management about his treatment. It was after I made these complaints that I learned that John pulled his pants down, pulled his cheeks apart and exposed himself in Joe's face and asked him, 'I bet you like that don't you Fag?' or words to that effect." Yearick Aff. ¶ 7. From the wording, it is impossible to tell whether the phrase "numerous times" included calling McIntyre a fag, or bullying, or other names, or whether this alleged bullying took place within the 300-day timeframe of the limitations period.

from behind on unspecified occasions prior to September 2013, and in August 2013, according to McIntyre, Sullivan made a comment that he had licked the straw on McIntyre's iced coffee cup and that McIntyre should think of him when he drank from that straw. Representatives from Corning's legal and global human relations departments investigated the allegations, which Sullivan denied. The investigation found that Sullivan had placed his hands on McIntyre's shoulders more than one time, but not as often as McIntyre had alleged, and not necessarily in a "massaging manner," and that they could not corroborate the straw licking. Consequently, they decided Sullivan had not committed a Code of Conduct violation. Sullivan agreed he would not touch other employees. McIntyre was informed by phone of the results.

In the fall of 2013, Rathburn conducted an all hands training session for CAO employees on the Corning Code of Conduct. He reminded employees that Corning strictly prohibited discrimination and harassment based on a protected category as well as retaliation for complaining about discrimination and harassment. In addition to the training, Lori Fagan, who had responsibility for CAO human relations prior to Rathburn, conducted one-on-one interviews with CAO employees to hear their concerns.

Corning contends that Sullivan no longer harassed McIntyre, but McIntyre disputes this and claims that Sullivan continued to harass and taunt him as late as April 2015. Pl.'s Statement of Disputed Material Facts ¶ 114. Corning also contends that Walter did not harass McIntyre after the September 2013 incident, but McIntyre disputes this as well, stating that:

> Walter did in fact engage in harassing conduct after the September 2013 complaint. On or about February 8, 2015, Walter sought to intimidate Plaintiff and other employees when he stated "anytime you go outside the department there will be consequences." On a separate occasion, he also accused Plaintiff and other employees as stealing from Corning. (McIntyre Affm.).

*Id*. ¶ 115. McIntyre does not contend that Manchester ever made a negative comment about

his stuttering, or any sexual comments or gender-based comments, or engaged in any sexual or gender-based conduct.

*The Other Line Technician Assignment*

Corning states that about August 2013, Jordaens assigned Jason Horth ("Horth"), another line technician who also possessed a teaching degree, to make safety and health presentations to groups of Corning employees in addition to his regular duties. McIntyre, however, contends that the presentations were made by Homer Northup ("Northup'), the coordinator for health and safety in the aviation department. McIntyre had assisted Northrup for years and in that role was never required to make presentations. Had Corning appointed McIntyre instead of Horth, Corning states that it would have been a lateral move for him, but McIntyre speculates that the assignment would have increased his responsibilities and may have led to other job opportunities at Corning or elsewhere that could have led to significant pay increases. Were McIntyre to have been chosen for that assignment, it would not have resulted in any change to his pay or job title. Regarding its choice, Corning asserts that McIntyre stated he did not enjoy speaking in front of groups, but McIntyre responds that he "never stated he did not enjoy speaking in front of groups (McIntyre Affm.)." *Id*. ¶ 122. At his deposition, McIntyre was asked the following questions and gave the following responses:

Q. Do you enjoy making presentations?

A. No.

Q. Do you enjoy speaking in front of groups?

A. No.

McIntyre Dep. 117:10–13.

*Plaintiff's Retaliation Claims*

After McIntyre submitted his EthicsPoint complaint in September 2013, Corning states that Walter and Manchester assisted McIntyre in completing his practical training so he could

obtain his FAA mechanic's license. McIntyre disputes this and claims that Manchester never assisted him, he also claims that with respect to his training, he was made to keep receipts for all expenses, unlike others who were only required to keep receipts for expenses exceeding twenty-five dollars. Pl.'s Statement of Disputed Material Facts ¶ 125. After September 2013, Manchester authorized Corning to pay for McIntyre's license review course and the test fees, as well as pay his wages during his course, even though Corning had no obligation to do so. McIntyre adds that Corning paid for yearly training for all employees in the Aviation Department without an obligation to do so. *Id*. ¶ 126.

*Plaintiff's Retaliatory Work Environment Claim*

McIntyre states that Manchester initially refused to authorize overtime pay for a Saturday during his two-week review course in Tennessee. McIntyre also provides a lengthy description of the situation, stating:

> On January 27, 2015, Plaintiff met with Defendant Manchester in the presence of Defendant Walter. Defendant Manchester indicated that Brad Cole brought him my time card with overtime sought. Plaintiff asked about time spent on Saturday, to which Defendant Manchester stated "we don't pay overtime when you're out of town. It's a policy change with new management, and I'm new management." Thereafter, Plaintiff wrote an e-mail to Human Resources Representative Michael Rathbun complaining that he was being treated differently than other employees with respect to time and compensation, including Ken Stacy, who had previously gone through the apprenticeship program and was compensated for his time spent in school on Saturday. It has always been common practice at Corning for employees to be paid for all the time spent in class. Mr. Rathbun agreed that it was company policy that employees are paid for time spent in training, regardless of the day. Later that day, Defendant Manchester called Plaintiff into his office. He began screaming and cursing at him. He was hostile and stated, among other things, "did you have a problem with the answer I gave you?" and "I don't know who you think you are, but you are free to take your license and walk out the door!" Plaintiff indicated he needed a day off as he had just returned from the FAA testing. Defendant Manchester stated, "While you were away, we changed the policy, you can no longer use comp time." Plaintiff then stated, "I'll take an unpaid day," to which Defendant Manchester responded "you can't do that, you have to use your vacation time." Plaintiff told Defendant Manchester that vacation time had already been disapproved, and Defendant Manchester had no real

response. This forced Plaintiff to refrain from taking any time off. (McIntyre Affm.).

*Id.* ¶ 127. Corning contends that Manchester understood that the review course ran Monday through Friday during regular hours and, therefore, did not intend to compensate McIntyre for Saturday merely because he normally worked on Saturdays. McIntyre disputes this and states that the review course ran for eight hours per day, Monday through Saturday, and that he did not normally work on Saturdays, but was scheduled Sunday through Thursday; therefore, Saturday for him would have been an extra shift regardless of whether he was in training or working at the hangar. *Id.* ¶ 128. In the end, Manchester and Rathbun agreed to have Corning pay the requested overtime. Walter assisted in verifying the hours so that McIntyre could be paid, and McIntyre did receive the overtime pay he requested.

### The Maintenance Compensatory Time Off Policy

Corning states that beginning in September 2013, its corporate-wide policy did not permit nonexempt employees to accrue, or bank, compensation time in lieu of receiving overtime pay, although McIntyre states that the aviation department had a long-standing use of compensation time. *Id.* ¶ 132. McIntyre was aware that he needed to use up his accumulated compensation time. However, McIntyre disputes the calculation of how many hours of it he had. *Id.* ¶ 134. In any event, instead of compensation hours, McIntyre received overtime pay for the overtime he worked during his review course. Corning contends that McIntyre did not request to use up any additional accumulated compensatory time after he was informed about the policy change for compensatory time. Plaintiff responds that he did bring up the issue in August 2013. *Id.* ¶ 137.

At his deposition, McIntyre agreed he had received overtime pay for compensatory time he was not permitted to use, but he estimated he had approximately sixteen hours of accumulated compensatory time for which he received no overtime pay. McIntyre Dep.

103:9–23. He agreed that Corning discontinued compensatory time for all department employees in January 2015. 104:3–14. McIntyre testified that Brett Bellows told him he had compensatory hours and Corning allowed him to use them. McIntyre Dep. 104:24–105:6.

Regarding the sixteen hours, Plaintiff was asked the following questions and gave the following responses:

A. I was informed that I was not going to get them as comp hours and I was not going to be paid for them either. It was after that, that I emailed HR and asked them what exactly the policy was.

Q. Correct. And after you contacted Human Resources then, you were then, in fact, paid the overtime; correct?

A. Yes, sir.

Q. So then my question is, after that, did you ever request to use accrued comp time hours?

A. No.

McIntyre Dep. 108:10–21.

### McIntyre's Vacation Days

McIntyre disputes Corning's assertion that none of his requests to take vacation time were refused. McIntyre states:

During the January 27, 2015 meeting, Plaintiff advised Defendant Manchester that his vacation request was disapproved. Additionally, John Walter told Plaintiff many times when he asked about vacation days, "I guess you really don't want to be a mechanic here," implying that Plaintiff should not take time off and try to get his license by the deadline he had previously mentioned. (McIntyre Affm.).

*Id*. ¶ 138.

### Emergency Pay

In February 2015, McIntyre and two other employees made a request to Corning for emergency pay for one Sunday because the employees had been called in to work two hours earlier than they had scheduled themselves. Corning states that McIntyre's Sunday shift was

a flexible one and that he and other line technicians scheduled their work hours based on the flight schedules posted earlier in the week. McIntyre disputes this and states:

> The proposed schedule for the weekend was published on Wednesdays. It was the Sunday employees['] responsibility to also post what hours they intended to work to cover the entire day's flights. It has happened that the schedule changes, and the scheduled employees work their schedules to cover during the rest the week. If a flight is early or delayed, we would also have that covered. We were not paid for 24 hour coverage and thus felt, according to published company policy, that we qualified for emergency pay and this [sic] contacted payroll to ask. (McIntyre Affm.).

*Id*. ¶ 139. During the next maintenance meeting, Walter informed McIntyre and the other line technicians they were not entitled to emergency pay. McIntyre disputes this and states that Walter told them the policy was that they were entitled to emergency pay but should not have put in for it and that there would be consequences for going outside the department. *Id*. ¶ 141.[7] Although Corning states that Walter told the employees they were considered on-call every day, all day, and had to be flexible on weekends to service the aircraft when needed, McIntyre contends that this is not true. *Id*. ¶ 142. Corning states that CAO management clarified the emergency pay policy to all maintenance employees, not just McIntyre, but McIntyre disputes this, responding:

> Defendants' actions were designed to turn Plaintiff's co-workers against him. Employees distanced themselves from Plaintiff. (McIntyre Affm.; Yearick Affm.). Two employees left the meeting due to the uncomfortableness they were feeling. The entire meeting was directed at Plaintiff and other two employees involved with the emergency pay. It was stated by Sid Spencer that he didn't appreciate being called a thief, and John Walter stated that is exactly what you did.

*Id*. ¶ 143.

---

[7] McIntyre cites no evidentiary proof in admissible form as authority for this statement; therefore, the Court will disregard it.

*Lunch Breaks*

During maintenance employee meetings with Human Resources in February 2015, Manchester learned that maintenance employees were not taking lunch breaks. Instead, they would eat their lunch sometime during their shift without taking a work free half hour break, as required by law. Manchester adjusted the shift schedules for CAO maintenance employees to include a half hour, unpaid lunch break for all department employees, not only McIntyre. McIntyre adds that "Defendants' actions were designed to turn Plaintiff's co-workers against him (Yearick Affm.)." *Id*. ¶ 145.

*Procedural History*

McIntyre did not file an Equal Employment Opportunity Commission charge until May 11, 2015, after he had filed this action in federal court on May 8, 2015. Pursuant to a stipulation between McIntyre and Corning, he filed an amended complaint on January 25, 2016, with a right to sue letter dated October 27, 2015.

McIntyre's amended complaint, ECF No. 14, is the operative pleading in this case and alleges the following causes of action:

(1) Disability discrimination under the Rehabilitation Act;

(2) Retaliation in violation of the Rehabilitation Act;

(3) Gender discrimination in violation of the New York State Human Rights Law;

(4) Disability discrimination in violation of the New York State Human Rights Law;

(5) Retaliation in violation of the New York State Human Rights Law;

(6) Breach of contract;

(7) Promissory estoppel;

(8) Loss of consortium;

(9) Gender discrimination in violation of Title VII of the Civil Rights Act;

(10)     Retaliation in violation of Title VII of the Civil Rights Act;

(11)     Discrimination in violation of the Americans With Disabilities Act; and

(12)     Retaliation in violation of the Americans With Disabilities Act.

## STANDARD OF LAW

*Summary Judgment*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). The party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact

could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## ANALYSIS

Because the case is here on both federal and diversity jurisdiction, the Court will review the federal claims first. Preliminarily, the parties have not disputed that, at least for the purposes of this motion, McIntyre's stuttering is a qualifying disability under the Americans With Disabilities Act ("ADA").

The Court will examine McIntyre's claims under the ADA, Title VII, the Rehabilitation Act, and the New York Human Rights Law[8] pursuant to the burden-shifting legal framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03 (1973). Under that framework, a plaintiff has the initial burden to establish a *prima facie* case of discrimination or retaliation. Proving a *prima facie* case requires only a *de minimis* showing that there exists a triable issue of fact. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 65-66 (2d Cir. 1995) ("plaintiff's burden of proof in a … discrimination action is *de minimis* at the *prima facie* stage, …"). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged denial. *Id*. If the defendant produces admissible evidence that supports its legitimate, non-discriminatory reason for the adverse action, then,

> "the McDonnell Douglas framework…disappear[s] and the sole remaining issue [is] discrimination *vel non*." *Reeves*, 530 U.S. at 142-43. The plaintiffs must

---

[8] "New York courts require the same standard of proof for claims brought under the NYHRL as those brought under Title VII, and thus, claims under the NYHRL and under Title VII are essentially identical." *Allen v. Advanced Digital Info. Corp.*, 500 F. Supp. 2d 93, 104 (N.D.N.Y. 2007).

then prove that the defendants intentionally discriminated against them on a prohibited ground. *See id*. at 143. Where, however, the plaintiffs "make a substantial showing" that the defendant's proffered explanation was false, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id*. at 146-47.

*Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)) (internal citations and quotations removed) (emphasis in original). In *Henry v. Wyeth Pharm., Inc*., 616 F.3d 134, 156 (2d Cir. 2010), the Second Circuit addressed the issue of the pretextual reason and wrote:

> In proving a case under Title VII, following the defendant's proffer of a justification,...[a] plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known be false. The crucial element of a claim under Title VII is discrimination, not dishonesty.

Regarding McIntyre's disability, the test is a "but for" one under both the ADA and the Rehabilitation Act, that is, but for Corning's alleged discriminatory motive, the adverse actions would not have occurred. *Eisner v. City of New York*, 166 F. Supp. 3d 450, 457–58 (S.D.N.Y. 2016); *Graham v. Three Vill. Cent. Sch. Dist.*, 11-CV-5182, 2013 WL 5445736 at *24-25, 2013 U.S. Dist. LEXIS 143264 at *65 (E.D.N.Y. Sept. 30, 2013); *see Natofsky v. City of New York*, No. 17-2757, 2019 U.S. App. LEXIS 11210 at *1–2 (2d Cir. Apr. 18, 2019) ("We hold that a plaintiff alleging an employment discrimination claim under Section 504 of the Rehabilitation Act must show that the plaintiff's disability was a but-for cause of the employer's action, not the sole cause."). "Summary judgment is appropriate where no reasonable jury could find that the defendant's actions were motivated by discrimination." *Mitchell*, 350 F.3d at 47; *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000).

*Denial of an Aviation Mechanic Position*

McIntyre alleges that he was denied the aviation mechanic position because of his disability. Under the ADA, he must show the following: (1) he is a member of a protected class; (2) he applied for a promotion to a position for which he was qualified; (3) he was rejected for that position; and (4) his employer kept the position open and continued to seek applicants having McIntyre's qualifications. *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004). The Rehabilitation Act mirrors the ADA but applies only to any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). For an ADA retaliation claim,

> a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517, 2528 (2013).

Regarding the issue of whether McIntyre met the qualifications Corning set out for the aviation mechanic positions at Corning, the Second Circuit has held that:

> "being 'qualified' refers to the criteria the employer has specified for the position." *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). Therefore, in order to establish a prima facie case of discrimination, [a plaintiff] must show that she met the defendant's criteria for the position.

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004).

Here, Corning's criteria called for at least three years of experience and an FAA license to be an aviation mechanic. Plaintiff argues that he had both (at least by the second application he made) and that, "[v]iewed in a light most favorable to Plaintiff, the court must credit the evidence that he had more than five years of experience working on aircraft." Pl.'s

Mem. of Law 4, Feb. 12, 2019, ECF No. 38. Yet, Corning's management was entitled to determine whether McIntyre met their experience level, and this Court cannot sit as a super-personnel department to reevaluate that decision. *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 106 (2d Cir. 2001) ("Because we are not a super-personnel department, it does not matter whether we find Byrnie's interview responses appropriate. An employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position.")

McIntyre also argues that the denial of the position arose under circumstances giving rise to an inference of discrimination and that the burden for so showing at the prima facie state is de minimus. He points to evidence of a history of admissions and discriminatory animus and conduct, pretext, disparate treatment, and irregularity. McIntyre contends that Corning's proffered reason (lack of experience) "is belied by the evidence revealing that it was in fact Defendant Sullivan who made the decision to deny Plaintiff the position by disallowing him from consideration." Pl.s' Mem. 13.

Corning responds that McIntyre is relying on his affidavit to substantiate these allegations and that affidavit contradicts his prior deposition testimony. In that regard, McIntyre was asked the following questions and gave the following answers regarding how he found out he was not going to be offered an aviation mechanic position:

Q. What did Mr. Manchester inform you?

A. That I was not receiving the position and he stated that I could come back from school and continue to work as an apprentice or something along those lines, or I could come home with an attitude and never become a mechanic.

Q. Okay. Did Mr. Manchester inform you that you did not have the requisite years of mechanic experience for the position?

A. I'm not certain if he brought that up during our meeting.

Q. Do you recall receiving an email from Kimberly Smithmen?

A. During a following hiring process.

Q. And did she inform you that the Hiring Manager was looking for someone with more experience?

A. During the second hiring process, yes.

Q. So at that time you understood that Mr. Manchester did not believe that you had the three years of mechanic experience; is that correct?

MS. BOSMAN: Objection. Form.

You can answer.

A. I'm aware after I applied for that position and I received her email that that was his stance on that.

McIntyre dep. 174:4–175:4. In contrast, McIntyre relates the following in his affidavit:

35. Ken Stacy, a member of the hiring team for the mechanic's position, called me a few hours after the meeting with Defendant Manchester. He apologized for how everything played out and advised me of what happened during the discussions of who to hire. He said that he and Ray Ferry, another member of the hiring team, both pushed very hard for me. Mr. Stacy stated he saw John Walter and Dave Manchester go across the hall to "Monty's" office before the decision was made. When they returned, it was announced that Sullivan said Kirk Gregg wanted more experience than they felt I possessed and that I was not able to be selected. They were directed to select another candidate.

McIntyre Aff. ¶ 35, Feb. 12, 2019, ECF No. 35. However, on this issue, McIntyre previously testified:

Q. Do you believe Mr. Sullivan was involved in the hiring decisions?

A. Yes.

Q. What is the basis of your belief?

A. Based on what I had heard.

Q. What did you hear?

A. That—that Dave Manchester and John Walter had gone in his office in between interviews.

Q. So someone told you that Mr. Manchester and Mr. Walter had gone into Mr. Sullivan's office at some point during the interview process?

A. Yes.

Q. And who told you that?

A. Ken Stacy.

Q. Did anyone else tell you that?

A. No one's name comes to mind off the top of my head.

Q. Did Mr. Stacy have any knowledge as to what was discussed in Mr. Sullivan's office during these meetings?

A: Any firsthand knowledge? Not that I'm aware of.

Q. Do you have any other reason to believe Mr. Sullivan was involved in the hiring decisions?

A. No.

McIntyre Dep. 162:6–163:6. The Court does not have any testimony or affidavit from Ken Stacy. McIntyre has provided no evidence that Sullivan directed Manchester not to hire him. Through hearsay,[9] he has shown that the two were in the same office together during the hiring process, but not what, if anything, Sullivan directed Manchester to do. Manchester's affidavit makes no mention of the topic. Manchester Aff., Oct. 29, 2018, ECF No. 25-5. McIntyre provided the 2013 investigative interview of Sullivan, but no evidence, other than his own affidavit and deposition testimony, regarding his allegation that Sullivan directed he not be offered an aviation mechanic job. McIntyre has evidently not deposed either Sullivan or Manchester. *See* Bosman Aff., Feb. 12, 2019, ECF No. 33 (listing all the exhibits provided in opposition to Corning's summary judgment motion).

It is well settled in the Second Circuit that a party opposing summary judgment may not create an issue of fact by submitting an affidavit in opposition that contradicts the affiant's prior deposition testimony. *See Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619

---

[9] McIntyre argues the hearsay is admissible under Fed. R. Evid. 801(d)(2)(D), Pl.s' Mem. of Law 6. Corning rejects that argument stating that at the time of the hearsay statement, the declarant was no longer a member of the hiring committee, thus no longer an agent of it, Def.s' Mem. of Law 4 n.3.

(2d Cir. 1996) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."); *see also Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

Plaintiff's counsel argues that the existence of a prior *consistent* statement can be considered by the Court and does not constitute a contrived factual dispute that is insufficient to survive summary judgment. The Court asked Plaintiff's counsel to present "a case that says that a prior consistent statement trumps a contradiction between the deposition and the affidavit submitted in support of in opposition to summary judgment, *i.e.*, that you can consider where there's a prior consistent statement, you can consider the affidavit in opposition." Trans. of Motion Argument, April 11, 2019, 37:7-12.

Plaintiff's counsel offers *Palazzo v. Corio*, in which the Second Circuit stated, "a party's deposition testimony as to a given fact does not foreclose a trial or an evidentiary hearing where that testimony is contradicted by evidence *other than* the deponent's subsequent affidavit." 232 F.3d 38, 43–44 (2d Cir. 2000) (emphasis added). Plaintiff's counsel believes the Court should disregard his contradictory deposition testimony because his subsequent affirmation is consistent with his prior EEOC complaint.

Plaintiff's counsel misses the mark. Contradictory evidence *other* than the deponent's subsequent affidavit does not foreclose summary judgment. In *Palazzo*, the Second Circuit held that "summary judgment was not foreclosed where the supposed factual dispute existed 'only because of inconsistent statements made by Perrino the deponent and Perrino the

affiant.'" *Id.* at 43 (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)). That Plaintiff's EEOC statements were made prior to a deposition "does not change this outcome." *Gunn v. United Parcel Service, Inc.*, 2016 WL 4523913 at 6, 2016 U.S. Dist. LEXIS 111927 at *15 (E.D.N.Y. Aug. 22, 2016). Deposition testimony trumps "any contradictory allegations made pre- and post-deposition" and the "timing of contradictory allegations does not matter." *Id.* (internal citations omitted).

In the matter before this Court, there are several instances in which Plaintiff's deposition testimony contradicts his affirmation, as well as his EEOC complaint. Statements made in Plaintiff's EEOC complaint with respect to harassment and protected activity after September of 2013 are conclusory and contradictory to his deposition testimony. This Court declines to decide against long standing Second Circuit precedent and will not disregard Plaintiff's deposition testimony in favor of his affirmation and EEOC complaint.

McIntyre also points to Yearick's[10] affirmation to imply that in the past, under a different manager, he would have been hired:

> 3. I am familiar with the apprenticeship program and the manner in which it was administered at Corning. It was an informal apprenticeship program that was tailored to the individual employee. There were a couple other mechanics that worked their way to an A&P mechanic through this program. Those include John Waschezyn, Ken Stacy, Brad Cole, and John Walter. In the beginning it was discussed and expected that Joe would also be moved into a mechanic position through the apprenticeship program but that all changed after he was sexually harassed and a complaint was made by me.

Yearick Aff. ¶ 3, Feb. 12, 2019, ECF No. 35-1. The other aviation mechanics Yearick refers to had been hired years earlier: Waschezyn in 1979; Walter in 1989; Stacy in 2007, two directors of maintenance ago. Yearick does not indicate whether, when those individuals were hired in 1979, 1989, and 2007 through the apprentice process, Corning was facing the same loss of

---

[10] Donald Yearick was McIntyre's former supervisor.

over 100 years of experience as it was in 2014.

McIntyre additionally argues that because of his complaint of sexual harassment against Sullivan (made on his behalf by Yearick) in 2013, Sullivan retaliated against him in 2015 during the hiring process. This evidence of protected activity lacks temporal proximity to the hiring decision date. As this Court observed in *Bennett v. Verizon Wireless*, No. 04-CV-6314 CJS, 2008 U.S. Dist. LEXIS 5373, at *10–11 (W.D.N.Y. Jan. 23, 2008):

> While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998) (holding that a strong temporal connection between the plaintiff's complaint and other circumstantial evidence is sufficient to raise an issue with respect to pretext).

*Simpson v. New York State Dept. of Civil Services*, 166 Fed. Appx. 500, 502 (2d Cir. Jan 9, 2006). Since the decision in *Simpson* is not precedential, *see* U.S. Court of Appeals, Second Circuit, Rules § 0.23(b), the Court also relies on the reasoning in decisions of two other circuits, which the Court finds persuasive on this point. *See Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309 (6th Cir. 2001) ("temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397-98 (10th Cir. 1997) (disagreeing with the plaintiff's argument that temporal proximity between protected activity and adverse employment action is always sufficient to survive summary judgment).

Regarding the allegation that Sullivan retaliated against McIntyre, Corning also points out that Sullivan became Director of Aircraft Operations in April 2014 and after that date McIntyre was permitted to attend a two-week long study course at Corning's expense. Such an act is inconsistent with an inference of discrimination. McIntyre asks the Court to apply the pretext-plus approach discussed in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). He argues that his evidence has shown that Corning lied about Sullivan's involvement in the hiring process and that lie should cause the Court to reject the proffered

reason and determine that a material issue of fact precludes summary judgment. Pl.s' Mem. of Law at 10. He also asks the Court to examine the entire record to determine whether McIntyre could satisfy his ultimate burden of proof. *Id*. 7. The Court has done so, and as was the determination in the case McIntyre cites, *Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000), finds that "plaintiff has presented no evidence upon which a reasonable trier of fact could base the conclusion that [disability or retaliation] was a determinative factor in defendants' decision to [not hire] him." *Schnabel*, 232 F.3d at 91.

McIntyre also argues that he engaged in additional protected activity in 2015 and Corning's failure to select him for the aviation mechanic position was also in retaliation for that protected activity. At his deposition, McIntyre was asked the following questions and gave the following answers:

> Q. Other than what we have already discussed, any other reasons why you believe your [sic] not receiving the Aviation Maintenance Technician position was retaliation?
>
> MS. BOSMAN: Objection. Form.
>
> You can answer.
>
> A. Um, and possibly for reaching out to HR on issues such as the overtime and being called in early.
>
> Q. Other than those things, any other reason that you haven't already told us about?
>
> A. Not off the top of my head.
>
> Q. Okay. And in connection with the overtime issue, can you explain how that— how you believe that relates to the decision-making process for the mechanic position?
>
> A. It was stated by John Walter that any time you go outside of the department, there will be consequences.
>
> Q. And what you're referring to there is the time in which you requested that you be paid overtime for the training that you performed on Saturday; is that correct?

MS. BOSMAN: Objection to form.

A. I do believe so.

Q. And the other issue that you mentioned was for the time in which you called in early. Is that the emergency time issue that we talked about earlier?

A. Yes.

Q. That was a situation in which you had requested premium pay for certain work you performed on the weekend; is that correct?

MS. BOSMAN: Objection to form.

A. Yes....

A. John Walter said you—any time you go outside of the department, there will be consequences.

Q. And what was the specific incident that he was referring to in which you had gone outside the department?

A. Um, that was following—that was when we had emailed Payroll about putting in for the emergency pay.

McIntyre Dep. 168:11–169:2; 268:3–10. However, going outside the department to advocate for overtime and emergency pay is not protected activity. The situation did not involve complaining about discrimination under the ADA or Title VII. *See Borders v. Policy Studies Inc.*, Civil Action No. RDB-07-638, 2008 U.S. Dist. LEXIS 61062, at *28 (D. Md. Aug. 5, 2008) ("This letter does not appear to be a "protected activity" within the meaning of Title VII, as it simply raised a pay dispute and made no mention of discrimination based on his race or sex, or any other category of discrimination covered by Title VII."). Further, Walter was not doing the hiring—Manchester was. Moreover, the overtime and emergency pay issues occurred after January 9, 2015, the date Manchester told McIntyre he did not select him for the aviation mechanic position. Manchester Aff. ¶¶ 27–28

The Court finds that McIntyre has not met his burden of establishing a *prima facie* case, that nevertheless Corning has proffered a non-discriminatory reason for its employment

decision, and that McIntyre has not shown that Corning's proffered reason for not hiring him as an aviation mechanic was false and that unlawful discrimination played a part in the decision.

*Hostile Work Environment*

Plaintiff contends that actions by Sullivan, especially, and others, created an objectively hostile work environment for him at CAO. To succeed on his hostile work environment claim, McIntyre must show: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his employment for the worse and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999); *see also, Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). McIntyre argues:

> In the instant matter, there is sufficient evidence to create a question of fact as to whether Defendants harassed Plaintiff because of his gender. He was referred to as a "fag." Defendants' motivation presents questions of fact based on the conduct directed at Plaintiff which includes exposure, unwelcome touching, and comments to Plaintiff of a sexual nature. A reasonable juror could conclude that the harassment directed at Plaintiff was the product of bias against him because he did not fit the image of the stereotypical male working in the mechanics field.

Pl.s' Mem. of Law 19. McIntyre cites to the number of years he endured harassment, the outrageousness of Walter's mooning and spreading his cheeks, and, according to McIntyre, saying to him, "I bet you like that, don't you, fag?" He also cites to Sullivan's shoulder-rubbing, mocking McIntyre's stutter, and invading his personal space. He argues as well that Sullivan's and Walter's conduct can be imputed to Corning. *Id.* 20.

Regarding Walter's mooning, McIntyre was asked the following questions and gave the following responses at his deposition:

Q. Do you think he did this because you were a male?

MS. BOSMAN: Objection. Form.

You can answer.

A. No.

Q. So you don't think your gender had anything to do with it, correct?

MS. BOSMAN: Objection. Form.

You can answer.

A. I think it was -- I think he had a problem with me. I don't think it was the fact that I am a male or a female....

Q. But you don't have any reason to believe he was making a sexual advance toward you?

MS. BOSMAN: Objection. Form.

You can answer.

A. Not — not at that time....

Q. So your testimony is -- today is you don't specifically recall any incident after this incident was reported in which John Walter harassed you, correct?

MS. BOSMAN: Objection. Form.

You can answer.

A. Correct.

McIntyre Dep. 64:3–14; 65:3–7; 66:16–22. Regarding Sullivan and the shoulder rubbing,

McIntyre testified:

Q. With respect to the shoulder rubbing, how often did this occur?

A. It was only increasing.

Q. Okay. But I'm asking you how often did Mr. Sullivan rub your shoulders?

A. It seemed like almost every time he went past me. At least a few times per week.

Q. Where did this occur?

A. Either outside on the patio or over by the—well, in the hangar and I think a few times out on the ramp, as well.

Q. During what time period was this occurring?

A. 2000–2013.

McIntyre Dep. 79:3–16. He also testified in response to this question:

Q. I'm trying to understand when you're testifying today if you have any reason to believe he was doing this because of your gender as a male?

MS. BOSMAN: Objection. Form.

You can answer again.

A. No.

McIntyre Dep. 84:24–85:5. The Court finds that McIntyre has not shown that he was subjected to a hostile work environment within 300 days[11] of his May 11, 2015, EEOC complaint.

*Retaliation*

McIntyre claims Corning subjected him to a retaliatory work environment in violation of his rights under the Rehabilitation Act, ADA, NYHRL, and Title VII. However, none of the conduct he relates establishes a retaliation claim. His dispute concerning overtime pay for a Saturday resulted in his receiving the pay. Thus, he suffered no adverse employment action. McIntyre has not shown how Corning's elimination of compensatory time was a retaliatory act against him. The change in policy at CAO brought that department into line with the rest of the corporation. Moreover, he used up two hours of accumulated compensatory time and received overtime pay in lieu of compensatory time for his extra hours spent at the review course. Nothing in Corning's denial of McIntyre's request for emergency pay hints at retaliation. The policy Corning cited to deny the request applied to all employees, not just McIntyre. As with

---

[11] The three-hundredth day was Tuesday, July 15, 2014.

the elimination of compensatory time, McIntyre has not shown how Corning's schedule adjustment to create an unpaid lunch break was done in retaliation. The policy applied to the entire department and was mandated by law. Moreover, Corning's acts were not temporally related to any protected activity.

## Federal Claims Against Individuals

McIntyre has named Claude Sullivan, David Manchester, John Walter, John Doe(s), and Jane Doe(s) in his federal claims. Individual employees cannot be held liable under the federal statutes on which McIntyre bases his claims. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) (Title VII); *Corr v. MTA Long Island Bus*, No. 98-9417, 1999 U.S. App. LEXIS 25058, at *5 (2d Cir. Oct. 7, 1999) ("there is no right of recovery against individual defendants under the ADA"); *see Romand v. Zimmerman*, 881 F. Supp. 806, 812 (N.D.N.Y. 1995) ("in regard to the ADA and Rehabilitation Act, it would appear to be unsound policy to allow claims against persons in their individual capacities under these statutes while not allowing them under Title VII."). Consequently, the individual federal claims must be dismissed.

## Loss of Consortium

Despite Plaintiff's contention to the contrary, claims under Title VII or the New York Human Rights Law cannot serve as the basis for a loss of consortium cause of action made by a non-employee's spouse. *Santiago v. Newburgh Enlarged City School District*, 434 F. Supp.2d 193, 198 (S.D.N.Y. 2006) (citing *Moss v. Stinnes Corp.*, 169 F.3d 784, 785 (2d Cir. 1999). The court in *Moss* also held that "neither the ADEA nor the [New York State] HRL affords a direct cause of action to a non-employee due to discrimination against his spouse. Moreover, neither statute provides for a claim for a loss of consortium." *Moss*, 169 F.3d at 785. A loss of consortium claim is derivative. If the primary claims from which it derives fail, the derivative claim must fail as well. *Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir.

1996). In most cases, the district court dispenses with the loss of consortium claim either by way of *Moss* or *Griffin*.

Plaintiff's counsel argues derivative claims are permissible under the Human Rights Law; therefore, Ann McIntyre's claim for loss of consortium should not be dismissed. She bases her conclusion on the Third Department's decision *In re Ithaca City School District v. New York State Division of Human Rights,* 87 A.D.3d 268 (3d Dept. 2011). In *Matter of Ithaca*, the Third Department found the State Division of Human Rights ("SDHR") had jurisdiction over the school district and upheld the awards to both the parent and the student made by the administrative law judge. *Id.* at 273. The student was the target of racially motivated harassment by other students in the district. *Id.* at 271. Her mother filed a claim with the SDHR on her daughter's behalf after numerous complaints to the school district did not stop the harassment. *Id.*

The appellate court disagreed with the school district's contention that the mother was not entitled to relief as she had filed the charge on behalf of her daughter. *Id.* at 275. Under Executive Law § 297(9), "any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages." The appellate court found the record revealed "sufficient independent proof" that the mother was aggrieved in her own right because of the school district's conduct, thus justifying an award of damages. *In re Ithaca CSD*, 87 A.D.3d at 275.

Contrary to counsel's assertion in her memorandum of law in opposition to Defendants' motion to dismiss, *In re Ithaca CSD* did not allow a derivative claim under the Human Rights Law. The Third Department chose its words carefully. The record revealed "sufficient *independent* proof" the mother was aggrieved because the school district failed to address the problem, despite her many complaints. The fact the mother filed the claim on

behalf of her daughter was not dispositive. Executive Law § 297(9) refers to *any* person claiming to be aggrieved. The mother was aggrieved on her own, for which she received an award.

The Court also notes that in *Wright v. City of Ithaca, N.Y.*, No. 5:12-cv-378 (GLS/TWD), 2012 U.S. Dist. LEXIS 67753, 2012 WL 1717259 (N.D.N.Y. May 15, 2012), counsel asserted a loss of consortium claim in an employment discrimination case while admitting that federal civil rights statutes do not permit one. The district court granted a defense motion to dismiss that claim, writing:

> Actions for loss of consortium are "not cognizable under federal civil rights statutes," see 2011 U.S. Dist. LEXIS 82392, [WL] at *24, nor may they be brought pursuant to the NYSHRL, *see Moss v. Stinnes Corp.*, 169 F.3d 784, 785 (2d Cir. 1999). Despite Melissa Wright's disagreement with the reasoning of these cases, and her citation to a state appellate decision which apparently permits a derivative claim under the NYSHRL, the court declines to upset this settled precedent.

*Wright*, 2012 U.S. Dist. LEXIS 67753, at *14. On appeal, the Second Circuit held that "even if we assume *arguendo* that such a claim is cognizable under federal or state law, her derivative claim must fall with her husband's principal claims" which were found to be untimely. 633 Fed. Appx. 63, 66 (2d Cir. 2016) (summary order). Accordingly, Anne McIntyre's derivative claim must fail both because the federal statutes do not permit it, and in any event, because her husband's claims are dismissed.

## CONCLUSION

For the foregoing reasons, the Court grants Corning's motion for summary judgment, ECF No. 25, in part and directs entry of judgment for Corning on all the federal claims alleged in the amended complaint, which includes the First, Second, Eighth (as derivative of the federal claims), Ninth, Tenth, Eleventh, and Twelfth causes of action. Because the Court has

dismissed all the federal causes of action, it declines to exercise jurisdiction over the state claims pursuant to 28 U.S.C. § 1367(c)(3). The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

DATED:  May 16, 2019
         Rochester, New York

<div style="margin-left: 50%;">

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

</div>